**Rockwell v. Knott**

158

*Albert J. Evans*, for plaintiff
*Gary N. Stewart*, for defendants

NEALON, *J.*, August 13, 2013—Defendants' motion for partial summary judgment in this motor vehicle litigation raises a novel issue of apparent first impression in this Commonwealth: whether a motorist, who is involved in an accident while looking downward at the display screen of a global positioning system ("GPS") application[1] on a cell phone, rather than at the roadway, may be liable for punitive damages? A motorist arguably may engage in recklessly indifferent conduct, and thereby be potentially liable for punitive damages, if [s]he completely diverts his or her attention from the roadway to observe a low positioned GPS device and nevertheless continues to travel on the roadway until [s]he collides with another vehicle. However, the record does not contain any evidence indicating that the defendant driver was viewing his GPS device, rather than the road and oncoming traffic, at the time that he removed his foot from the brake and initiated a left turn into plaintiff's path of travel. Therefore, plaintiff's proffered proof of the defendant driver's alleged outrageous conduct is insufficient as a matter of law, and defendants' motion for partial summary judgment will be

---

1. GPS navigation applications are commonly used on modern cell phones, such as iPhones and similar wireless communications devices, to provide location and directional assistance. Oxton, *The Search Incident to Arrest Exception Plays Catch Up: Why Police May No Longer Search Cell Phones Incident to Arrest Without a Warrant*, 43 Creighton L. Rev. 1157, 1203 (June 2010). The GPS receivers "can determine latitude, longitude, altitude, direction, and speed by receiving and processing location information from the transmissions of the four nearest orbiting GPS satellites." Serwin, Habte & Brown, *Privacy In An Interconnected World*, 28 No.4 GPSolo 34, 35 (June 2011).

granted.

## I. FACTUAL BACKGROUND

This personal injury suit arises out of an automobile accident which occurred on August 24, 2011, at the intersection of East Union Street and North Washington Street in Wilkes-Barre, Luzerne County. At that time, plaintiff, Steven Rockwell ("Rockwell"), was travelling eastbound on East Union Street, while defendant, Glenn Knott ("Knott"), was proceeding in a westerly direction on East Union Street. (Docket entry no. 7 at ¶¶6, 14; docket entry no. 18 at ¶¶6, 14). Knott was operating a Ford Van that was owned by his employer, defendant, New Prime, Inc. ("New Prime"), and was acting within the course and scope of his employment with New Prime at that time. (Docket entry no. 7 at ¶¶6-7; docket entry no. 18 at ¶¶6-7).

Knott brought his vehicle to a stop in the westbound, left-hand travelling lane of East Union Street, "intending to turn left onto the southbound lane of North Washington Street." (Docket entry no. 7 at ¶¶9, 22; docket entry no. 18 at ¶¶9, 22). Rockwell has alleged in his amended complaint that as a Knott was stopped at the intersection, he "began fidgeting with his GPS unit, taking his eyes off of the road," and diverted his attention "from oncoming traffic for a substantial and significant amount of time." (Docket entry no. 7 at ¶¶11-12). Knott and New Prime have specifically denied those allegations in their responsive pleading. (Docket entry no. 18 at ¶¶11-12). Rockwell further avers that "[a]s [he] attempted to drive through the foregoing intersection in the eastbound lane of East Union Street, Mr. Knott abruptly turned left into Mr. Rockwell's lane." (Docket entry no. 7 at ¶16). Knott and

New Prime have also denied that assertion, and contend to the contrary that "Rockwell's motorcycle struck Glenn Knott's vehicle." (Docket entry no. 18 at ¶16).

Rockwell commenced this action on February 17, 2012, and asserted a negligence claim against Knott, a vicarious liability claim against New Prime, and a direct claim against New Prime for negligent hiring and training of Knott. (Docket entry no. 7 at ¶¶21-53). In count IV of the amended complaint, Rockwell seeks to recover punitive damages from Knott and New Prime. Rockwell alleges that "Knott knew that it was dangerous to operate his GPS at the same time that he was operating a vehicle," and "knowingly and intentionally chose to be distracted by his GPS system while he was operating a motor vehicle." (*Id.* at ¶¶56, 59). Rockwell further maintains that "New Prime knowingly and intentionally failed to train, inform, educate, and prohibit its employees from acting as distracted drivers and from operating a GPS system while driving." (*Id.* at ¶67). As a result of that alleged "willful, wanton or reckless behavior" by Knott and New Prime, Rockwell advances a claim for punitive damages. (*Id.* at p. 14).

During Knott's discovery deposition, he testified that on August 24, 2011, New Prime instructed him to drive a fellow employee from its Pittston business to a bus station in Wilkes-Barre, and since Knott was unfamiliar with that particular site, he printed MapQuest directions to that location. (Deposition of Glenn Knott dated 6/7/12, attached as exhibit A to docket entry nos. 26 and 28, at pp. 18, 44). However, after following those directions and arriving at the destination that had been provided by MapQuest, Knott and his co-employee discovered that

the bus station had relocated. (*Id.* at p. 44). Consequently, Knott contacted New Prime's dispatcher, obtained the correct address for the bus station, and programmed that new address into the GPS application on his wireless communications cell phone. (*Id.* at pp. 47-48). Knott then placed his cell phone in the lower center console and angled its screen towards him so that he "could see it" as he drove to the bus station. (*Id.* at p. 47).

According to Knott, once he arrived at the intersection of East Union Street and North Washington Street, he "stopped" the van, "took a glance down at [his] GPS... just to make sure [he] was on the right street," and then "glanced back up" at "the Washington Street sign" before taking his foot off the brake. (*Id.* at pp. 50-51). When questioned further regarding the use of his GPS and the circumstances surrounding the accident, Knott testified:

Q. Now, let me make sure your testimony is accurate. When that last vehicle goes through the intersection, the last car you see, you look down at your GPS?

A. Yes, as it was coming through the intersection, I took a glance down to the GPS to make sure it was Washington, like the road I was going on was the correct road, yes.

\* \* \*

Q. And when you looked down at the GPS, the car coming in the opposite direction was already in the intersection, the last car.

A. Yes.

Q. Then what did you do then?

A. I looked forward to see my lane was clear and I — that's why I perceived the lane was clear. I didn't see anyone in the straight lane.

\* \* \*

Q. And then you started to move, turn, make your left-turn?

A. I took my foot off the brake and it moved forward.

Q. Help me understand that just so we're clear. I don't want to misunderstand what you're saying. So you looked up at the street sign. You see it says Washington Street, and then you take your foot off the brake.

A. Yes.

Q. And at the time you take your foot off the brake, where are you looking?

A. Well, I was moving my eyes down towards the street in front of me.

Q. So when you took your foot off the brake, you were moving your eyes from the Washington Street sign down to the —

A. To the street in front of me, yes.

Q. And when you took your foot off the brake, the vehicle started to move forward?

A. Yes.

Q. And did you have the wheel turned one way?

A. Yes.

Q. What way did you have it turned?

A. Turn left to make the turn.

Q. Did you put your foot on the gas at all?

A. No.

\* \* \*

Q. And your vehicle was already moving at the first —
when you first saw the motorcycle?

A. This, when I first saw it, yes, and then I hit the brake.

Q. And then you hit the brake. When you hit the brake,
did your vehicle stop immediately?

A. I believe it stopped like right prior to impact, yes.

(*Id.* at pp. 57, 59-61).

After the close of discovery and following the filing of a certificate of readiness for trial, Knott and New Prime filed a motion for partial summary judgment with respect to Rockwell's punitive damages claim. Knott submits that there is no evidence in the record to support the allegations in Rockwell's pleading that Knott "was looking at his GPS when he began to make the left hand turn, i.e., that he violated a traffic law and was distracted." (Docket entry no. 26 at p. 5). In the alternative, Knott posits that even "assuming *arguendo* that Mr. Knott was looking at his GPS when he began to turn left, such an act does not constitute evidence to satisfy the heightened legal standard necessary to prove a claim for punitive damages." (*Id.* at p. 8). New Prime similarly maintains that the record lacks any proof that New Prime's hiring

and supervision of Knott constituted wanton, willful or recklessly indifferent conduct, particularly since Rockwell "has produced no evidence to demonstrate that Knott was not properly supervised or managed while working as a security guard." (*Id.* at p. 10).

In opposition to defendants' motion for partial summary judgment, Rockwell cites the deposition testimony of Knott's supervisor, Richard Yarborough, who stated that all New Prime drivers are advised "not [to] use GPS" because [t]hey're dangerous" and "take your attention from the road." (Docket entry no. 26, exhibit C at p. 26). Rockwell asserts that Knott "ignored this directive" and "proceeded to drive 'blindfolded' despite being specifically instructed not to do so by Mr. Yarborough." (Docket entry no. 26 at p. 5). Rockwell further argues that Knott has "not cited any case law that specifically addresses whether or not the use of a GPS while driving constitutes the type of recklessness that supports a punitive damages claim," and that "in cases such as the one at bar, it is not the province of the court to opine on the propriety of imposing punitive damages, as it is well-settled that the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder, in this case the jury." (*Id.* at p. 6).

As for his punitive damages claim against New Prime, Rockwell contends that "New Prime's failure to explain to Mr. Knott how to get from Pittston to the Wilkes Barre bus terminal can be construed as reckless indifference, because it knew that the terminal was a destination that Mr. Knott may be required to travel." (*Id.* at p. 7). Based upon that reasoning, Rockwell argues that "a reasonable jury could infer that New Prime failed to properly train, education

and/or supervisor its employees." (*Id.*). Defendants' motion for partial summary judgment was scheduled for oral argument on July 17, 2013, but the parties later agreed to submit this matter on briefs and without the necessity of oral argument.

## II. DISCUSSION

### (A) STANDARD OF REVIEW

Summary judgment is appropriate "only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Hovis v. Sunoco, Inc.*, 64 A.3d 1078, 1081 (Pa. Super. 2013). In making that determination, the record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *State Farm Fire and Casualty Company v. DeCoster*, 67 A.3d 40, 45 (Pa. Super. 2013). However, "[w]here the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment." *E.R. Linde Construction Corp. v. Goodwin*, 68 A.3d 346, 349 (Pa. Super. 2013); *Rock v. Rangos*, 61 A.3d 239, 250 (Pa. Super. 2013). The failure of the non-moving party "to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." *J.P. Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1261 (Pa. Super. 2013); *Wright v. Eastman*, 63 A.3d 281, 284 (Pa. Super. 2013). Where the facts are so clear that reasonable minds could not differ that a verdict should be entered in favor of the moving party, a trial court may

properly enter summary judgment. *Hovis, supra*; *Shiner v. Ralston*, 64.A.3d 1, 4 (Pa. Super. 2013).

## (B) DISTRACTED DRIVING CLAIM

Rockwell contends that Knott's use of his GPS while driving, when coupled with his supervisor's admonition to avoid use of a GPS while operating a vehicle, requires submission of the punitive damages claim to the jury based upon "the fact that [Knott] was practically operating a motor vehicle blindfolded after being told of the dangerous (sic) associated with the same and voluntarily ignoring those warnings." (Docket entry no. 26 at p. 6). "Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct." *J.J. DeLuca Co. v. Toll Naval Associates*, 56 A.3d 402, 415-416 (Pa. Super. 2012). Wanton misconduct or reckless indifference "means that 'the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'" *Weston v. Northampton Personal Care, Inc.*, 62 A.3d 947, 961 (Pa. Super. 2013) (quoting *Smith v. Brown*, 283 Pa. Super. 116, 120, 423 A.2d 743, 745 (1980)). "Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison v. Luddy*, 582 Pa. 114, 124, 870 A.2d 766, 772 (2005); *Millan v. Pennsylvania American Water Co.*, 25 Pa. D. & C. 5th 181, 186 (Lacka. Co. 2012).

Punitive damages claims have been permitted against motorists in narrow sets of circumstances indicating unreasonable actions by defendants in conscious disregard of known or obvious risks which pose a high probability of harm to others. In *Focht v. Rabada*, 217 Pa. Super. 35, 268 A.2d 157 (1970), the Superior Court of Pennsylvania addressed the merits of a punitive damages claim against a drunken driver, and held that "we believe that driving while under the influence of intoxicating liquor with its very great potential for harm and serious injury may under certain circumstances be deemed 'outrageous conduct' and 'a reckless indifference to the interests of others' sufficient to allow the imposition of punitive damages." *Id.* at 40, 268 A.2d at 160. *Accord Schwab v. Bates*, 12 Pa. D. & C. 4th 162, 167-168 (Westmoreland County 1991) (plaintiff may recover punitive damages from estate of deceased tortfeasor who was driving while intoxicated at time of fatal accident). Other courts have allowed punitive damages claims to proceed against sober motorists who otherwise engage in wanton or reckless conduct. *See, e.g., Dillow v. Myers*, 916 A.2d 698, 702 (Pa. Super. 2007) ("Allowing a truck to go out on the road where the load could not properly be distributed because of a broken loading rack; not braking when travelling down hills so that the truck exceeded the speed limit; driving with limited visibility because the listing of the back of the truck obscured the view from the side mirror; and changing lanes under these circumstances without signaling is sufficient evidence to justify a jury's conclusion that the Defendants' conduct was outrageous."), *app. denied*, 594 Pa. 713, 937 A.2d 445 (2007); *Freethy v. Goike*, 2011 WL 7177007, at *6 (Lacka. Co. 2011) (since "[t]he operation of a vehicle in a construction zone arguably requires greater care and

caution by motorists due to the presence of construction workers and equipment, altered routes, excavated road surfaces, traffic congestion, slower moving vehicles, and sudden stopping by those vehicles," punitive damages claim could proceed against defendant who "ignored a posted stop sign, operated her vehicle at an excessive rate of speed, and rear-ended a vehicle directly in front of her" in a construction zone); *Hough v. Meyer*, 55 Pa. D. & C. 4th, 473, 476-477, 493 (Fayette Co. 2002) (punitive damages were recoverable based upon truck driver's conscious decision to drive his vehicle onto plaintiffs' property and into their home after driver lost control of his truck due to brake failure); *Claypoole v. Miller*, 43 Pa. D. & C. 4th 526, 528 (Butler Co. 1999) ("...a jury could reasonably interpret defendant Miller's actions of operating a vehicle when she knew she was having trouble staying awake as reckless, wanton and outrageous conduct."); *Faust v. Stish*, 43 Pa. D. & C. 4th 134, 138 (Monroe Co. 1999) ("However, applying one's brakes while travelling at a high rate of speed with the knowledge that there is a vehicle directly behind you also travelling at a high rate of speed and other vehicles on the same roadway moving at much slower speed may constitute reckless indifference to the right of other motor vehicle occupants to safely travel on the Commonwealth's roadways.").

Although no Pennsylvania appellate court has yet to address the viability of a punitive damages claim predicated upon a motorist's use of an interactive wireless communications device or GPS application at the time of an accident, several trial courts in Pennsylvania have considered the recoverability of punitive damages in accidents involving cell phone use or text-based

communication on a wireless communications device. In *Kondash v. Latimer*, No. 09 CV 8622 (Lacka. Co. Nov. 19, 2012), visiting Senior Judge Harold A. Thomson, Jr., declined to grant a motion to strike that was filed by a defendant who allegedly caused an accident while "talking on, texting or otherwise utilizing a wireless phone, personal digital assistant ("PDA") or other handheld device." *Id.* at p. 2. Rejecting defendant's attempt to strike the foregoing texting and cell phone use allegations, the *Kondash* court reasoned:

> We agree that the authorities have not yet spoken directly to this particular issue. However, the Plaintiffs' suggestion regarding municipal statutes that address driving while utilizing hand-held devices is well-taken. The Kondashes point out that several municipalities in the Commonwealth, including Allentown and Harrisburg, have enacted laws which make it illegal for a driver to use such a device while driving. From this circumstance, the Plaintiffs infer that the illegalization of this act reflects the dangerous, and possibly deadly consequences of shifting part of one's complete attention and gaze away from driving and towards talking, texting or emailing from a smart phone.
>
> It remains to be seen whether Defendant Lattimer was doing anything of the sort at the time of the accident. Discovery has not concluded, and the facts are very much in question. We are not speculating about what happened to cause this accident, but we are ruling that it is possible that a jury may be called on [to] consider whether communicating on a PDA while driving is a wanton and reckless act, in instances where the driver

is involved in an accident and is responsible to some degree..... We will overrule the Defendant's preliminary objection raising this very new question of law, which is far from clear and free from doubt, in the attached Order.

*Id.* at pp. 3-4.[2]

In contrast, the court in *Xander v. Kiss*, 2012 WL 168326 (Northampton Co. 2012), concluded that a punitive damages claim against a defendant who "was speaking on his cellular telephone at the time of the accident" could proceed forward only if there was some "additional indicia of recklessness" besides the mere use of a cell phone. *Id.* at \*2. More recently, Monroe County Judge Arthur L. Zulick similarly concluded in *Platukis v. Pocono Segway Tours, LLC*, No. 6941 CV 2012 (Monroe Co. April 8, 2013) that cell phone usage alone does not give rise to a claim for punitive damages. In sustaining a demurrer that was filed by a defendant who "was using a cellular phone at the time of the collision, and was operating the Segway at an excessive rate of speed," Judge Zulick reasoned that

---

2. Questions arose as to whether the municipal ordinances banning texting while driving were preempted by state law or otherwise in conflict with the Pennsylvania Vehicle Code, and in 2012, Pennsylvania "became the 35th state in the United States to enact a ban on text messaging while driving." *Franklin, Done With Distracted Driving: Implications of Pennsylvania's Ban on Text-Based Communication While Driving Under the State Constitution*, 117 Penn St. L. Rev. 171, 176 (Summer 2012). Section 3316(a) of the Vehicle Code became effective on March 8, 2012, and provides that "[n]o driver shall operate a motor vehicle on a highway or trafficway in this Commonwealth while using an interactive wireless communications device to send, read or write a text-based communication while the vehicle is in motion." 75 Pa.C.S. §3316(a). A "text-based communication" is defined as "a text message, instant message, electronic mail or other written communication composed or received on an interactive wireless communications device." 75 Pa.C.S. §3316(f).

"[w]hile using a cellular phone while operating a motor vehicle is undoubtedly risky, that alone still does not give rise to the state of mind necessary to find [defendant] acted recklessly." *Id.* at p.3. *See also Leonard v. Schlabach*, No. A.D. 2012-172, at p. 9 (Crawford Co. July 16, 2012) (citing *Xander* with approval, dismissing punitive damages claim against defendant who was allegedly using his cell phone while driving, and concluding that "it appears that the proper inquiry here is whether the allegations in Plaintiffs' complaint constitute the type of 'additional indicators' or aggravating factors that could elevate Defendant's conduct from mere negligence to the type of willful, wanton or reckless conduct that would justify punitive damages.").

The only reported federal court rulings in Pennsylvania have likewise reached conflicting conclusions in cases involving cell phone use while driving. In *Pennington v. King*, 2009 WL 415718 (E.D. Pa. 2009), U.S. District Judge Gene E.K. Pratter denied "Defendant's Motion for Partial Summary Judgment as to Plaintiffs' claim for punitive damages" based upon proof that defendant "was distracted by his cellular phone conversation and was operating his tractor-trailer in a widely erratic manner so as to prevent [plaintiff] from passing him." *Id.* at * 6. However, in *Piester v. Hickey*, 2012 WL 935789 (E.D. Pa. 2012), U.S. Magistrate Judge Lynne Sitarski adopted the standard articulated in *Xander* "that a properly-pled punitive damages claim requires *additional* facts, such as well-pled allegations that defendant exceeded the posted speed limit, or disregarded traffic signals, or otherwise drove erratically." *Id.* at * 4 (emphasis in original). Since the plaintiffs in *Piester* did not aver additional facts "supporting a claim for outrageous behavior sufficient

to establish Defendants' 'evil motive' or 'reckless indifference' to Plaintiffs' rights," the punitive damages claim was dismissed. *Id.*

Other jurisdictions have also applied different approaches when analyzing punitive damages claims against motorists who have allegedly caused accidents while speaking on cell phones. Most of those courts agree that cell phone usage alone is insufficient to support an award of punitive damages. *See Thompson v. Cooper*, 290 P.3d 393, 402 (Alaska 2012) ("We have never ruled that using a cell phone while driving, alone, amounts to reckless indifference, and we decline to do so here."). Some jurisdictions have concluded that the use of a cell phone, in combination with a violation of a Vehicle Code provision or other recognized rule of the road, creates a triable issue of fact regarding the recovery of punitive damages. *See McLane v. Rich Transport, Inc.*, 2012 WL 3257658, at *6 (E.D. Ark. 2012) (denying motion for partial summary judgment relative to punitive damages claim against tractor trailer driver who was talking on his cell phone and had driven more than seventy hours in the eight-day period before the accident, in violation of 49 C.F.R. 392.3); *Gaddis v. Hegler*, 2011 WL 2111801, at * 4 (S.D. Miss. 2011) (denying motion to dismiss punitive damages claim against driver who "ran a red light, and ignored other warnings signs immediately prior to the accident because she was talking on her cell phone."); *Laney v. Schneider National Carriers, Inc.*, 2011 WL 1667434, at * 3 (N.D. Okla. 2011) (denying motion for partial summary judgment as to request for punitive damages against tractor trailer driver who was allegedly using his cell phone, travelling too fast for the

existing road conditions, and fatigued because he was not in compliance with the hours of service regulations); *Howell v. Kusters*, 2010 WL 877510, at * 2 (Del. Super. 2010) (granting plaintiff's motion to amend complaint to include claim for punitive damages against motorist who "was travelling up to twenty miles over the speed limit as she approached the intersection" and "was talking on her cell phone as she went through the red light, and entered the intersection."); *Hoskins v. King*, 676 F.Supp.2d 441, 444-445, 451 (D.S.C. 2009) (punitive damages could be recovered against driver who "was talking on her mobile phone" and "in the process of attending to her dogs in the front seat or manipulating the car stereo when she struck [plaintiff]."). Other courts have adopted a heightened test that requires proof of "other aggravating circumstances," beyond violations of the rules of the road, in order to recover punitive damages from a motorist who is using a cell phone at the time of the accident. *See Lindsey v. Clinch County Glass, Inc.*, 312 Ga. App. 534, 536, 718 S.E.2d 806, 808 (2011) (stating that "evidence of mobile phone use did not, without more, establish a policy or pattern of dangerous driving," and affirming dismissal of punitive damages claim since "there is no evidence of a policy or pattern of dangerous driving or other aggravating circumstances.").

Texting while driving significantly increases the degree of driver distraction since it requires the motorist to completely divert his or her attention from the roadway as [s]he focuses upon the mobile device. As such, texting poses a much greater risk to pedestrians and other motorists than speaking on a cell phone. *Cf. Sipler v. Trans Am Trucking, Inc.*, 2010 WL 4929393, at * 4 (D.N.J. 2010) (dismissing

punitive damages claim against tractor trailer driver who "was talking on his hands-free cell phone at the time of the collision," and finding that "[w]hile such conduct may be negligent, it does not show wanton and willful disregard of Plaintiffs' safety...."). Indeed, section 3316(a) of the Pennsylvania Vehicle Code, 75 Pa.C.S., only bans text messaging while driving and does not prohibit a motorist from engaging in cell phone conversations while driving. *See* Harding, *The Failure of State Texting-While-Driving Laws*, 13 U. Pitt. J. Tech. L. & Pol'y 1, 13 (Spring 2013); Franklin, 117 Penn. St. L. Rev. at 178.

A motorist's use of a GPS device may, or may not, cause distracted driving depending upon the type and placement of the GPS device and the concomitant operation of the vehicle. Portable GPS navigation devices are equipped with brackets which enable the device to be mounted on the surface of the dashboard or affixed to the windshield without obstructing the driver's view of the roadway or diverting the operator's eyes from the roadway. *See* Saulen, *"The Machine Knows!": What Legal Implications Arise for GPS Device Manufacturers When Drivers Following Their GPS Device Instructions Cause an Accident?*, 44 New Eng. L. Rev. 159, 166 (Fall 2009). Smart phone owners may also purchase a holder which will enable them to attach their phone to the windshield when using it as a GPS device. Allen, *2011 Techno-Gift Guide*, 28 No. 8 GPSolo 36, 48 (Dec. 2011) ("If you know someone who wants to use an iPhone as a GPS device, consider getting a holder that will attach the iPhone to the windshield so that it can receive the satellite signal and the display can be seen hands-free."). Knott apparently did not possess such a bracket or holder since his cell phone was located

in the cup holder of the center console at the time of the accident.

The position of the GPS device, the extent of the driver's distraction, and the distance travelled by the vehicle during that period of diversion are important factors in determining whether the motorist is chargeable with outrageous conduct. *See Westray v. Wright,* 834 N.E.2d 173, 180-181 (Ind. 2005) (semi-truck driver who "looked down at the open map on the seat next to him to verify driving directions" for a matter of seconds "was clearly negligent in the operation of his vehicle," but was not liable for punitive damages). If the GPS device is affixed to the dashboard or windshield of the vehicle, such that the operator maintains peripheral vision of the roadway, a motorist's split second glimpse at its screen is akin to a momentary glance at a speedometer or side or rearview mirror, and does not constitute reckless indifference or wanton misconduct. However, if a driver completely diverts his or her attention from the roadway to view a GPS device which is not located on the dashboard or windshield, and continues to travel in his or her vehicle without any view of the roadway or other traffic, [s]he may be deemed reckless.

In light of Richard Yarborough's testimony that New Prime's drivers are cautioned against using GPS navigation systems since such devices divert their attention from the roadway, a genuine issue of material fact exists as to whether Knott had a subjective appreciation of the risk of harm posed by use of a GPS. Although Rockwell alleged in his amended complaint that Knott's attention was diverted "for a substantial and significant amount of time" due to the GPS device, the summary judgment record

is devoid of any such proof. Even when viewed in the light most favorable to Rockwell, the record reflects that as the final approaching vehicle entered the intersection from the opposite direction, Knott looked at the GPS to ensure that he was at the correct intersection. Knott then "glanced back up" at the street sign for Washington Street, looked forward in the direction of oncoming traffic, and proceeded to take his foot off the brake as he began his left turn. Reasonable minds could not differ that such conduct by Knott does not constitute reckless, distracted driving.

If the record contained some evidence suggesting that Knott was viewing the GPS device positioned in the lower center console as he proceeded to make a left turn without yielding the right of way to Rockwell, in violation of Section 3322 of the Vehicle Code, 75 Pa.C.S., an issue of fact would exist as to whether Knott's recklessly indifferent conduct warrants the submission of Rockwell's punitive damages claim to the jury. At the summary judgment stage, Rockwell can no longer rely upon his averment that Knott was so distracted "for a substantial and significant amount of time," and no such evidence is present in the record submitted for review. As a result, Rockwell's evidence in support of his punitive damages claim against Knott is insufficient as a matter of law, and Knott's motion for partial summary judgment will be granted.

## (C) HIRING AND SUPERVISION OF KNOTT

In addition to his punitive damages claim against New Prime based upon its vicarious liability for Knott's actions, Rockwell has asserted a separate claim for punitive damages against New Prime based upon its alleged willful failure "to train, inform, educate, and prohibit its

employees from acting as distracted drivers and from operating a GPS system while driving." (Docket entry no. 7 at ¶67). The only evidence submitted by Rockwell in support of that independent claim is the deposition testimony of Knott's supervisor, Richard Yarborough. (Docket entry no. 26, exhibit C).

Mr. Yarborough testified that Knott received safety training known as "the Smith System," which is "a defensive and awareness-type course" involving "videos, tests, as well as on-the-road driving with a coach or instructor." (*Id.* at p. 22). Knott was also required to satisfactorily complete an over-the-road driving test in the presence of an instructor. (*Id.* at pp. 23-24). When asked by Knott's counsel to describe any "training that you give a security guard like Glenn Knott" relating to the use of GPS devices, Mr. Yarborough stated:

> ...we tell our drivers the same thing: Do not use GPS's. They're dangerous. They take your attention from the road, which is what the Smith System and our defensive driving is all about. You have to be aware of the road. And if you're looking down texting, using a GPS, any type of device, even cell phones — they're required to have headsets...not handhelds, but headsets.

(*Id.* at p. 26).

The only evidence that has been presented by Rockwell does not create a triable issue of fact as to whether New Prime willfully or wantonly failed to train or supervise its employees with respect to the dangers of distracted driving and use of GPS devices while operating a vehicle. Once again, Rockwell may not rely upon the averments of his amended complaint to create a genuine issue of material

fact in that regard. Accordingly, New Prime's motion for partial summary judgment as to Rockwell's direct and vicarious claims for punitive damages will be granted. An appropriate order follows.

## ORDER

And now, this 13th day of August, 2013, upon consideration of the "Motion for Partial Summary Judgment to Dismiss Claims for Punitive Damages" filed by defendants, Glenn Knott and New Prime, Inc., and the exhibits and memoranda of law submitted by the parties, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. The motion for partial summary judgment of defendants, Glenn Knott and New Prime, Inc., is granted; and

2. Count IV of the amended complaint setting forth claims for punitive damages against defendants, Glenn Knott and New Prime, Inc., is dismissed.